IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 29, 2020

## JIM HUDGINS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County
No. 111382   Bobby R. McGee, Judge**

_____

### No. E2019-02173-CCA-R3-PC

_____

The Petitioner, Jim Hudgins, appeals the Knox County Criminal Court's denial of his petition for post-conviction relief, seeking relief from his conviction of first degree premediated murder and resulting life sentence.  On appeal, the Petitioner contends that he received the ineffective assistance of counsel because trial counsel failed to present evidence that he was too intoxicated to form the requisite intent for premeditation.  Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Jim Hudgins.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Takisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

On October 16, 2013, the Petitioner shot and killed the victim, Larry Turner.  In August 2014, a Knox County jury convicted the Petitioner of first degree premeditated murder.

The Petitioner appealed his conviction to this court, and we have summarized the facts from this court's opinion as follows:  The Petitioner and Laura Swaggerty were in a relationship sixteen years before the shooting and had a daughter (hereinafter "the

daughter"). State v. James K. Hudgins, No. E2015-01363-CCA-R3-CD, 2016 WL 4413281, at *1 (Tenn. Crim. App. at Knoxville, Aug. 18, 2016), perm. app. denied, (Tenn. Oct. 19, 2016). Ms. Swaggerty ended her relationship with the Petitioner three months after the daughter was born, and Ms. Swaggerty began dating the victim in December 2011. Id. At the time of the shooting, the victim, Ms. Swaggerty, the daughter, and the victim's son lived in a home on Churchwell Avenue. Id. The daughter testified at trial that she eventually came to regard the victim as a second father, and Ms. Swaggerty testified that the Petitioner and the victim "had always interacted peacefully and civilly" prior to the shooting. Id.

On the evening of the shooting, the Petitioner got into a confrontation with the victim outside of Ms. Swaggerty's mother home. See id. at *1-2. Ms. Swaggerty and the daughter, who also were outside, testified that the Petitioner appeared to be intoxicated. Id. at *1. Some of the Petitioner's friends pulled him away from the confrontation. Id. at *2. The Petitioner and a female companion drove away from the scene, and the Petitioner returned to his own home. Id.

The Petitioner telephoned the victim, and Ms. Swaggerty heard the victim say, "'Hmm, you're going to kill me. Okay. You know where I'm at.'" Id. During the call, the victim handed his telephone to the daughter and asked if he had ever molested her. Id. The daughter told the Petitioner that the victim had never molested her. Id. Ms. Swaggerty testified that prior to that night, she had never heard the Petitioner allege that the victim had molested the daughter. Id. The daughter testified that the victim had never touched her inappropriately. Id.

The Petitioner's son and mother arrived at the Petitioner's home while the Petitioner was on the telephone with the victim. Id. The Petitioner's son testified that he heard the Petitioner speaking with someone. Id. The Petitioner "'looked angry'" and said into the telephone that he "'was going to kill [the person].'" Id. After the call, the Petitioner asked his mother to drive him to the daughter's house and said he was "'going to shoot the bastard that molested [his] daughter.'" Id. The Petitioner's mother began driving the Petitioner and the Petitioner's son to the daughter's house. Id. The Petitioner's mother said she needed to use the restroom, stopped at a Kroger grocery store, and went inside and called the police. Id. The Petitioner and his son remained outside in the vehicle. Id. While they were waiting for the Petitioner's mother to return, the Petitioner told his son that the Petitioner was "'probably going to die with'" the victim and that the Petitioner was going to give the victim "'a one-way ticket to heaven.'" Id.

Knoxville Police Department Officer Jeremy Moses arrived at the Kroger at 9:12 p.m., approached the vehicle, and spoke with the Petitioner. Id. at *3. Officer Moses told the Petitioner that he had received a call that a person in the vehicle was behaving

suspiciously.  Id.  Officer Moses said that the Petitioner appeared "quite intoxicated" and that he asked the Petitioner how much the Petitioner had had to drink.  Id.  The Petitioner never provided a specific amount and did not say the daughter was being molested.  Id.  Another officer went into the Kroger and returned with the Petitioner's mother.  Id.  At that point, the officers learned about allegations that the daughter was being molested and learned the daughter's address.  Id.  The officers left the Kroger parking lot at 9:35 p.m. and went to a home on Churchwell.  Id.  They knocked on the doors and windows but did not receive a response.  Id.  Meanwhile, the Petitioner's mother drove the Petitioner and his son back to the Petitioner's residence.  Id.  The Petitioner and his son went inside, and the Petitioner's mother left.  Id.

The Petitioner's son testified that the Petitioner was "'just pacing'" in the living room, that he did not speak to the Petitioner because he did not want to upset the Petitioner, and that he knew the Petitioner was "emotionally fragile."  Id.  The Petitioner told his son, who had a learner's permit, that they should "'go riding'"; handed his son the keys; and suggested that they drive by the daughter's house to see if anyone was home.  Id. at *3. The Petitioner's son drove the Petitioner to the daughter's residence, and the Petitioner attempted to telephone her.  Id.  at *4.  The victim answered the telephone and told the Petitioner that the Petitioner could not speak with the daughter because she was sleeping. Id.  The Petitioner's son said that the Petitioner went onto the front porch and that the Petitioner was "'obviously mad.'"  Id.  Ms. Swaggerty heard the Petitioner "'banging'" on the door, heard the victim argue with the Petitioner, and heard the Petitioner accuse the victim of molesting the daughter.  Id.  The daughter testified that she heard the Petitioner's voice and that he did not sound intoxicated.  Id.  Ms. Swaggerty, the daughter, and the Petitioner's son heard gunshots.  Id.  The Petitioner's son testified that he heard "'five pops.'"

Ms. Swaggerty and the daughter ran outside to check on the victim, and the daughter saw the Petitioner "'walking away.'"  Id.  Several neighbors also heard the gunshots and attempted to help the victim, who appeared to have been shot at least twice in the chest. Id.  One of the neighbors applied towels to the victim's wounds to stop the bleeding, but the blood stopped flowing and the victim stopped breathing several minutes later.  Id.

The Petitioner's son drove him from the scene, and the Petitioner said he needed to go to Walmart to buy a new charger for his telephone.  Id.  After buying the charger, the Petitioner had his son drive him to the home of friends Dennis and Diane Graves.  Id.  The Petitioner's son testified that the Petitioner was not intoxicated at that time and that he would have known if the Petitioner was "drunk."  Id.

- 3 -

The Petitioner arrived at the Graves home about 1:00 a.m. and told them that he "'did something bad.'"  Id. at *5.  The Petitioner began crying, and Mr. and Mrs. Graves convinced him to turn himself in to the police.  Id.

The medical examiner who performed the victim's autopsy testified that the victim was shot five times and that several shots were fired at close range.  Id.  A forensic scientist for the Tennessee Bureau of Investigation testified about four .40-caliber casings recovered from the scene.[1]  Id.  All of the .40-caliber casings were fired from the same handgun, most likely a Glock or Smith & Wesson Sigma.  Id.

Dennis Graves and the Petitioner testified for the defense.  Id.  Mr. Graves testified that he talked with the Petitioner twice on the day of the shooting.  Id.  Mr. Graves said that he first spoke with the Petitioner in the afternoon, that the Petitioner sounded "'[s]mashed'" and "'[d]runk,'" and that the Petitioner "could barely speak and had slurred speech."  Id.  The Petitioner telephoned Mr. Graves later that evening and sounded "even more intoxicated than he did during the first phone call."  Id.  Mr. Graves stated that when the Petitioner arrived at his home after the shooting, the Petitioner "appeared upset and frustrated."  Id.  The Petitioner began crying and told Mr. Graves, "'I've done the most horrible thing I could.  God will never forgive me. . . . I've shot a man and I think he's dead.'"  Id.  Mr. Graves said the Petitioner had overheard a conversation between the daughter and two of her friends in which the daughter claimed the victim was molesting her.  Id.

The Petitioner testified that on day of the shooting, he went to Applebee's for lunch and consumed six double vodkas.  Id.  About 2:00 or 3:00 p.m., the Petitioner drove home "drunk."  Id.  The Petitioner then went to a bar with a female friend and consumed seven or eight drinks.  Id.  The Petitioner testified that he was "'really drunk'" and that he did not remember making his second telephone call to Mr. Graves.  Id.

The Petitioner testified that he and his female friend ended up at a home across the street from the daughter's grandmother's house and that he continued to consume alcohol.  Id. at *6.  The Petitioner went across the street to ask the daughter, who was outside with the victim and Ms. Swaggerty, if she was going to spend time with him during the upcoming weekend.  Id.  The Petitioner testified that "'[she] said that she had plans, but when she did she got this kind of smirk on her face, and she glanced over at [the victim], and he's looking back at her, and they kind of pass this look.  It was weird.  It just wasn't right.'"  Id.  The Petitioner thought that something was "very 'wrong'" and thought that

---

[1] According to this court's opinion, five casings were "recovered from the scene": One Winchester .380 casing and four .40-caliber casings.  Id.  However, our review of the trial transcript shows that the .380 casing was actually found in the victim's pocket during the victim's autopsy.

- 4 -

the daughter was having sex with the victim.  Id.  The Petitioner accused the victim of being "'nothing but a child molester,'" and the victim did not respond to the Petitioner's statement.  Id.  The Petitioner's friends led him away from the scene, and the Petitioner's female friend drove him home because he was too "drunk" to drive.  Id.

The Petitioner testified that he continued drinking alcohol at his home and that he telephoned the daughter.  Id.  The victim answered but would not let the Petitioner speak with her.  Id.  The Petitioner said that the victim did not hand the telephone to the daughter and that the daughter never told the Petitioner that the victim was not molesting her.  Id.  The Petitioner's mother and son arrived at his home, and the Petitioner remembered telling the victim that he was going to kill the victim.  Id.

The Petitioner testified that he asked his mother to drive him to the daughter's home and that they left in his mother's van.  Id.  The Petitioner testified about stopping at Kroger and said he never told his son that he was going to give the victim "'a one-way ticket to heaven.'"  Id.  The Petitioner talked with police officers in the Kroger parking lot.  Id.  He told them that he thought the daughter was being molested and that the victim threatened him.  Id.  The Petitioner acknowledged that the daughter never told him that the victim was molesting her.  Id.

After leaving Kroger, the Petitioner's mother dropped him off at home, and he resumed consuming alcohol.  Id.  Later that night, the Petitioner had his son drive him to the victim's house so that he could remove the daughter from the victim's home.  Id.  According to this court's opinion, the Petitioner "recalled the precise route that they took to get to the residence, identifying all of the streets on which they traveled."  Id.  The Petitioner approached the victim's house about 11:00 p.m. and had his Glock .40-caliber pistol in a holster on his hip.  Id.  The Petitioner said that he only went to the home to get the daughter and that he had his gun "because the victim was much larger than he was." Id.

The Petitioner testified that he "'pounded'" on the door.  Id. at *7.  The Petitioner told the victim that he knew what was "'going on,'" and the victim responded, "'What if I am? . . . Prove it.'"  Id.  The Petitioner removed his gun from its holster, pointed the gun at the victim, and pulled the trigger.  Id.  The Petitioner said that after the shooting, he realized he had "'just made a terrible mistake'" and that he was so traumatized he could not think clearly.  Id.  Nevertheless, he "agreed that he had been able to explain and recall the events and conversations that preceded the killing and that he was able to point out portions of the son's, Ms. Swaggerty's, and the daughter's testimony that he believed were inaccurate." Id.  The Petitioner also agreed "that despite his heavy drinking, he was able to clearly recall details that preceded the killing."  Id.

The Petitioner testified that he went to Walmart to buy a new telephone charger so that he could report the killing to the police. Id. After purchasing the charger, the Petitioner made several telephone calls, including a call to his mother. Id. He disassembled his gun, had his son pull over, and threw the gun into a lake. Id. The Petitioner recalled going to the Graves home but said he did not tell Mr. Graves that he overheard the daughter tell her friends that the victim was molesting her. Id. The Petitioner said the victim was the first person he ever accused of molesting the daughter. Id.

Kellie Martin testified on rebuttal for the State that she worked at Applebee's, that she served the Petitioner on the day of the shooting, and that the Petitioner did not appear to be "drunk." Id. Ms. Swaggerty testified on rebuttal that when the daughter was four or five months old, the Petitioner "would call the police and do welfare checks saying [the daughter] was being molested." Id. Finally, the daughter testified on rebuttal that she did not have a conversation with her friends about the victim molesting her and that "she did not give the victim a look as if she [were] having sexual intercourse with him." Id. at *8.

After the jury convicted the Petitioner of first degree premeditated murder, the trial court sentenced him to life in confinement. On appeal of his conviction to this court, the Petitioner claimed that the evidence was insufficient to support the conviction, that the trial court erred by admitting jailhouse telephone calls between the Petitioner and his mother into evidence, and that the trial court erred by permitting testimony that the Petitioner previously had accused someone of molesting the daughter. Id. This court affirmed the Petitioner's conviction. Id. at *12. In finding the evidence sufficient, this court explained, in pertinent part, as follows:

> The defendant argues that he was so intoxicated that he was incapable of premeditation and that he should have been convicted of voluntary manslaughter. While voluntary "intoxication itself is not a defense to prosecution for an offense," it "is admissible in evidence, if it is relevant to negate a culpable mental state." [Tenn. Code Ann.] § 39-11-503(a). Whether the defendant's intoxication negated his ability to premeditate and form the intent to kill were questions for the jury to consider and resolve. State v. Vaughn, 279 S.W.3d 584, 602 (Tenn. Crim. App. 2008). Similarly, whether a "killing resulted from 'a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner' is a jury question." State v. Williams, 38 S.W.3d 532, 539 (Tenn. 2001) (quoting [Tenn. Code Ann.] § 39-13-211(a)).
>
> Here, the jury resolved both of these questions against the defendant. He contends that the jury unreasonably rejected evidence of the copious amount of alcohol that the defendant consumed on the day of the shooting,

including the testimony of several of the State's witnesses. While the defendant testified that on the day of the shooting, he had been drinking all day, and while the daughter and Ms. Swaggerty testified that he appeared drunk during the confrontation in front of Ms. Swaggerty's mother's home, there was also evidence to show that the defendant was not so intoxicated that he was incapable of premeditation. The son testified that the defendant did not appear drunk at the time of the shooting or after the shooting, and he testified that he would know if the defendant was drunk. Similarly, the daughter testified that the defendant did not sound drunk when he was arguing with the victim just before the shooting. Further, the defendant was able to recall the events that led up to and followed the shooting in great detail, even identifying portions of the testimony that he believed were inconsistent with his recollection of the night of the killing. The jury found that the defendant's intoxication did not negate his ability to premeditate and form the intent to kill, and the evidence is sufficient to support that finding. Similarly, the jury heard evidence that the defendant believed that the victim was molesting the daughter. By their verdict of guilty to the charge of first degree (premeditated) murder, the jury necessarily rejected the claim that the defendant acted in "a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." [Tenn. Code Ann.] § 39-13-211(a). This question was in the province of the jury, and we conclude that the evidence is sufficient to support the defendant's conviction. He is not entitled to any relief.

Id. at *10.

After our supreme court denied the Petitioner's application for permission to appeal, he filed a timely petition for post-conviction relief, claiming that he received the ineffective assistance of counsel because trial counsel failed to cross-examine witnesses effectively, failed to present evidence that would have "countered" the State's witnesses, failed to object to "obviously perjured" testimony, and "did not present any kind of defense at all." The post-conviction court appointed counsel, and post-conviction counsel did not file an amended petition.

At the evidentiary hearing, the Petitioner testified that trial counsel died about two months after his trial and that another attorney represented him on direct appeal of his conviction. The Petitioner said that trial counsel met with him three or four times before trial and that their discussions were "mostly" about trial counsel telling the Petitioner "what a great lawyer he was in the Eric McLean case." The Petitioner told trial counsel he had receipts which showed that the Petitioner had been drinking alcohol on the day of the shooting. The Petitioner told trial counsel to obtain his bank records, but trial counsel

- 7 -

"didn't bother doing that." The Petitioner said that he consumed alcohol at Applebee's, Preservation Pub, and Latitude 35 prior to the shooting and that his bank statements would have shown that he spent almost one hundred dollars for alcohol at Preservation Pub and Latitude 35. Post-conviction counsel asked the Petitioner, "Do you have those [bank records] with you?" The Petitioner said yes, and post-conviction counsel asked to see the records. However, post-conviction counsel did not introduce the records into evidence.

The Petitioner testified that at the time of the shooting, he had been prescribed three Opana pills and two hydrocodone pills per day. Moreover, after the Petitioner's trial, he learned that his mother had "drugged" him on the night of shooting by putting "a handful of Xanax" into his drink. The Petitioner did not tell trial counsel about being drugged because he did not know about it at the time of trial.

The Petitioner testified that the State offered to let him plead guilty to second degree murder. However, trial counsel told the Petitioner, "'I'm not going to let you take that. . . . I can get that at trial just based on your intoxication. . . . We're going for manslaughter.'" The Petitioner asked trial counsel how much "time" he could receive for second degree murder, and trial counsel responded, "Well, that doesn't matter. . . . [W]e're not taking it." The Petitioner wanted to accept the State's plea offer because the range of punishment for second degree murder was fifteen to twenty-five years, but trial counsel would not let the Petitioner accept the offer.

The Petitioner testified that trial counsel failed to cross-examine "most" of the witnesses at trial effectively. For example, Kellie Martin testified that she served the Petitioner "six doubles in two hours" at Applebee's but that he was not intoxicated. Trial counsel should have cross-examined Martin about her "server's license" and how to "spot" the effects of alcohol on an intoxicated person. Trial counsel also did not effectively cross-examine the State's ballistics expert, who testified that the Petitioner used hollow point bullets to shoot the victim. The Petitioner said he actually used "controlled expansion" bullets. The Petitioner explained that hollow point bullets caused "maximum damage and death" whereas controlled expansion bullets were designed to "knock down" a victim, not kill the victim. The Petitioner said his use of controlled expansion bullets supported his testimony that he did not intend to kill the victim.

The Petitioner testified that the victim was shot five times but that only four .40-caliber casings were found at the scene. The Petitioner told trial counsel that the State's facts were not "lining up," but trial counsel "just dismissed it." The Petitioner said that he did not fire the fifth bullet and that the fifth bullet could have been the bullet that killed the victim. Trial counsel never cross-examined the State's witness about the fact that only four bullets were fired from the Petitioner's gun. Trial counsel also did not argue that fact during his closing argument. The "only real argument" trial counsel made during closing

was that the Petitioner was intoxicated at the time of the shooting. However, trial counsel failed to obtain the Petitioner's bank statements or introduce his prescriptions into evidence in order to prove his intoxication.

The Petitioner testified that trial counsel seemed "quite impaired" during the trial, that trial counsel was "nodding out," and that the Petitioner kept having to "nudge" trial counsel in order to get trial counsel to pay attention. The Petitioner said trial counsel "wasn't on his A game" and "seemed to completely drop the ball" in the Petitioner's case. Trial counsel failed to call any investigators to testify. When the Petitioner expressed concern about no investigators testifying, trial counsel told the Petitioner, "'I know what I'm doing. I've done 35 murder trials.'" The Petitioner said that if trial counsel had "put on investigators," the defense could have presented evidence that vindicated the Petitioner "at least in the eyes of some of the jurors."

The Petitioner testified that he never received a psychological examination because trial counsel said the Petitioner did not need one. The Petitioner thought he needed an examination, explaining, "I don't know how you can say you're in the heat of passion or you're, you know, basically temporarily gone insane if you don't have a professional there who can either collaborate or not collaborate." The Petitioner said he did not intend to kill the victim. He said he went to the victim's house that night because he just wanted to take the daughter to the police department so that she could be interviewed in a controlled setting without being influenced by the victim or Ms. Swaggerty.

On cross-examination, the Petitioner testified that on the night of the shooting, he went onto the victim's front porch and yelled through the door that he wanted to see the daughter. At some point, the Petitioner called the victim "a child molester." The Petitioner said that he was "holding [onto] the wall" and that his gun was on his hip. The victim came outside, and the Petitioner demanded to see the daughter. The victim told the Petitioner no, so the Petitioner asked to speak with Ms. Swaggerty. The victim again told the Petitioner no. The Petitioner said that "this [went] back and forth" and that he became "completely frustrated." The Petitioner told the victim that he knew the victim was a child molester, and the victim responded, "'Well, what if I am? What are you going to do about it?'" The Petitioner shot the victim.

The Petitioner acknowledged that he testified at trial about the liquor he consumed before the shooting. The Petitioner's mother and son told Ray and Melissa Green about the level of the Petitioner's intoxication, and the Greens could have testified at trial about what the Petitioner's mother and son told them. Ray Green was the "arresting officer" in the Petitioner's case. On redirect examination, the Petitioner testified that his mother was unable to testify at the evidentiary hearing because she was deceased. On recross-examination, the Petitioner acknowledged that his mother was present during his trial.

- 9 -

The parties chose to forego closing arguments, and the post-conviction court announced its ruling. The post-conviction court said that "[t]his Court tried this case" and that "there was certainly nothing to indicate that [trial counsel] was impaired in any way. The Court would have intervened had that occurred." The post-conviction court stated that trial counsel's defense strategy was to show that the Petitioner was too intoxicated to premeditate killing the victim, which was "about the only strategy available." The post-conviction court noted that the Petitioner's son testified at trial that the Petitioner "was able to walk okay" and was not intoxicated and that the Petitioner's daughter also testified that he did not sound intoxicated before the shooting. The post-conviction court found that trial counsel "tried a defense and it didn't work" and denied the petition for post-conviction relief.

After the post-conviction court announced its ruling, post-conviction counsel advised the post-conviction court that the court needed to address the issue regarding trial counsel's refusal to allow the Petitioner to accept the State's plea offer. The State noted that the Petitioner did not introduce any emails or letters about the alleged offer into evidence and asserted that the Petitioner's testimony about the alleged offer was "questionable." The State advised the post-conviction court that the State never made a plea offer to the Petitioner, noting that this court could not consider that statement as evidence. The post-conviction court found that the Petitioner failed to establish by clear and convincing evidence that the State ever made a plea offer to the Petitioner.

## II. Analysis

On appeal, the Petitioner claims that trial counsel was ineffective because, given the defense's strategy, it was "imperative" that trial counsel present all proof available to show that the Petitioner was too intoxicated to premeditate the killing.[2] The Petitioner contends that trial counsel should have obtained the Petitioner's bank records to show that the Petitioner spent almost one hundred dollars on alcoholic beverages prior to the shooting and that the bank records would have bolstered the Petitioner's credibility. The Petitioner also contends that trial counsel should have presented proof that the Petitioner had been prescribed three Opana pills and two hydrocodone pills daily due to a severe back deformity and that trial counsel should have presented proof that his "late" mother told several people she "drugged" him with Xanax on the night of the shooting. The State argues that the trial court properly denied the petition for post-conviction relief. We agree with the State.

---

[2] We note that the Petitioner did not raise the issue regarding the plea offer in his appellate brief.

- 10 -

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

Turning to the instant case, the Petitioner claims that trial counsel should have introduced the Petitioner's bank records and prescriptions into evidence at trial. However, the Petitioner failed to introduce the bank records or prescriptions into evidence at the

evidentiary hearing. We note that the Petitioner brought the bank records to the evidentiary hearing but that post-conviction counsel did not introduce the records into evidence. The Petitioner also did not have any witnesses testify at the hearing about his mother's drugging him with Xanax on the night of the shooting. This court may not speculate as to the content of a witness's testimony. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Therefore, the Petitioner has failed to show that trial counsel was deficient for failing to present the evidence at trial.

Regardless, several of the State's witnesses at trial, including the Petitioner's daughter, testified that the Petitioner was intoxicated at some point on the day of the shooting. Mr. Graves also testified for the Petitioner that the Petitioner was intoxicated. The proof showed, though, that in the hours leading up to the victim's death, the Petitioner made several declarations of intent to kill the victim. Even the Petitioner's own son testified that the Petitioner said he was going to kill the victim. Moreover, the Petitioner's son said that the Petitioner was angry but not intoxicated at the time of the shooting. On direct appeal of the Petitioner's convictions, this court noted that the Petitioner was able to recall at trial the "precise" route that he and his son took to get to the victim's residence. Likewise, we note that although the shooting occurred more than six years before the evidentiary hearing, the Petitioner was able to recall what occurred on the victim's front porch prior to the shooting. Therefore, we also conclude that the Petitioner has failed to demonstrate that he was prejudiced by any deficiencies by trial counsel. Accordingly, the post-conviction court properly denied the petition for post-conviction relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE